# In the United States District Court for the Southern District of Georgia Brunswick Division

NEW COVENANT CHURCH, INC.;
CARLOS L. WILLIAMS; FELICIA
WILLIAMS, individually and on
behalf of others similarly
situated, and CATHERINE
ARMSTRONG,

     Plaintiffs,

     v.

JEANINE R. ARMSTRONG; YVETTE D.
CLAYBORNE; CARLA FUTCH, S.
FERGUSON, and one unknown
officer, in their individual
and official capacities as
Police Officers for the City of
Brunswick, Georgia; and
PRIMESOUTH BANK,

     Defendants.

CV 2:19-040

## ORDER

Before the Court is Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction. Dkt. No. 12. The Court held an evidentiary hearing on April 18, 2019. Dkt. No. 23. For the reasons that follow, Plaintiffs' Motion for a Temporary Restraining Order is **DENIED as moot**. Plaintiffs' Motion for a Preliminary Injunction is **GRANTED in part and DENIED in part**.

The heart of this case involves a dispute primarily between a mother and her daughters over control of a church at which their

husband/father used to preach.  The specific facts brought forth at the evidentiary hearing are set forth below.

## FINDINGS OF FACT

### New Covenant Church's Origins

1. Defendant Jeanine Armstrong testified that New Covenant Church started as a family bible study at the Armstrong family's kitchen table.

2. Defendant Jeanine Armstrong testified that the bible study moved from the kitchen table to the dining room, and then, as members outside the family began to attend, to the Armstrong family's living room, where it was held on Wednesday nights for years.

3. Defendant Jeanine Armstrong testified that Albert Armstrong headed these bible studies.

4. Defendant Jeanine Armstrong testified that Albert Armstrong eventually incorporated New Covenant Church, Inc. ("NCC") and then acted as its founder, pastor, and chief executive officer.

### Articles of Incorporation and the 1989 Bylaws

5. NCC is a non-profit corporation "organized under and pursuant to the Georgia Nonprofit Corporation Code," O.C.G.A. § 13-1-101 *et seq*.  Dkt. No. 25-1 at 69.

6. NCC was incorporated on August 4, 1989.  Id. at 72.

7. Albert Armstrong was the sole incorporator of NCC.  Id.

AO 72A
(Rev. 8/82)

8. The Articles of Incorporation state that NCC "shall be managed by a Board of Trustees. The method of election of Trustees shall be as determined by the By-laws of the Corporation." Id. at 70.

9. On December 3, 1989, the sole incorporator, Albert Armstrong, adopted Bylaws for NCC (the "1989 Bylaws"). Id. at 68.

10. The 1989 Bylaws provide that NCC "shall be managed by a Board of Trustees." Id. at 63.

11. The 1989 Bylaws provide that "the number of Trustees constituting the entire Board shall be no less than three." Id.

12. The 1989 Bylaws provide that "at each Annual Meeting of Members, the membership shall elect Trustees to hold office until the next Annual Meeting." Id.

13. The 1989 Bylaws provide that "[e]ach Trustee shall hold office until the expiration of the term for which he was elected, and until his successor has been duly elected and qualified, or until his prior resignation or removal as hereinafter provided." Id. at 63-64.

14. The 1989 Bylaws provide that "[a]ny or all of the members of the Board of Trustees may be removed with or without cause by vote of the members of the Corporation. The Board of Trustees may remove any trustee thereof for cause only." Id. at 64.

AO 72A
(Rev. 8/82)

15.    The 1989 Bylaws provide that "the eligibility and qualifications for membership, and the manner of and admission into membership shall be prescribed by resolutions duly adopted by the Board of Trustees of the Corporation or by such rules and regulations as may be prescribed by the Board of Trustees." Id. at 59.

16.    The 1989 Bylaws provide that "[a]ll such resolutions or rules and regulations relating to members adopted by the Board of Trustees of the Corporation shall be affixed to the By-laws of the Corporation, and shall be deemed to be a part thereof." Id.

17.    The 1989 Bylaws provide that an "Annual Meeting of Members of the Corporation shall be held on such date or dates as shall be fixed from time to time by the Board of Trustees of the Corporation." Id. at 59-60.

18.    The 1989 Bylaws provide that "[t]he Chairman of the Board of Trustees shall be the chief executive officer of the Corporation, shall have the responsibility for the general management of the affairs of the Corporation, and shall carry out the resolutions of the Board of Trustees." Id. at 65.

19.    The 1989 Bylaws provide that "[d]uring the absence or disability of the Chairman of the Board of Trustees, the Secretary shall have all the powers and functions of the President." Id. at 66

20.   The 1989 Bylaws provide that "[a]ll By-laws of the Corporation shall be subject to alteration or repeal, and new By-laws may be made, by a majority vote of the members entitled to vote in the election of directors, at a special meeting of the members called for such purpose." Id.

21.   The 1989 Bylaws provide that the "Board of Trustees shall have the power to make . . . repeal, from time to time, By-laws of the Corporation," id. at 67, but much of this provision is not readable.

## Albert Armstrong Suffers a Stroke and Ceases Preaching from the Pulpit

22.   Plaintiff Felicia Williams swears that Albert Armstrong "suffered the first of a series of strokes" sometime in 2016 and stopped preaching from the pulpit as a result. Dkt. No. 26 ¶ 12.

23.   Plaintiff Catherine Armstrong, who is Albert Armstrong's wife, testified that Albert Armstrong's stroke was in December 2016 and that after it he stopped fulfilling his pulpit duties.

24.   Defendant Jeanine Armstrong testified that Albert Armstrong had a stroke in December 2016 and that he entered into rehabilitation as a result.

25.   Defendant Jeanine Armstrong testified that after the stroke Albert Armstrong returned to live at his house in

Brunswick with Plaintiff Catherine Armstrong, but that Catherine Armstrong could not take care of him and that Albert Armstrong was frequently falling at the house and suffered from bed sores.

26. Defendant Jeanine Armstrong testified that the Brunswick Fire Department was called by Plaintiff Catherine Armstrong more than thirty-one times to help Albert Armstrong up after he had fallen.

27. Plaintiff Felicia Williams swears that from the time of Albert Armstrong's stroke to the installation of Plaintiff Carlos Williams as pastor on August 20, 2017, NCC had "a rotation of preachers who preached Sunday services." Dkt. No. 26 ¶ 13.

28. Cynthia Nelson testified that it had been "at least two years" since Albert Armstrong was in the pulpit.

**January 27, 2017 Board Meeting**

29. On January 27, 2017, the NCC Board held a meeting. Dkt. No. 25-4 at 1.

30. The meeting minutes state that "Pastor Al [Armstrong] and Pastor Cathy [Armstrong] have decided to pass the mantle over to Minster [sic] Carlos Williams. They will still be actively involved with the ministry (more like Overseers)." Id. at 4.

AO 72A
(Rev. 8/82)

31.     The minutes were signed on that day by Albert Armstrong
        and Felicia Williams. Id. at 5.

**March 21, 2017 Board Meeting**

32.     Another meeting of the NCC Board was held on March 21,
        2017. Dkt. No. 25-4 at 18.

33.     The meeting minutes state that a pastor installation
        ceremony was scheduled for Sunday, July 16. Id. at 20.

**Carlos Williams Becomes Pastor of NCC**

34.     Carlos Williams testified that he became pastor of NCC
        on August 20, 2017, and that he was installed by Albert and
        Catherine Armstrong.

35.     He testified that at that time the problems with the
        Armstrong family that give rise to this action had not yet
        begun.

**Albert Armstrong Ceases to Attend NCC, Stops Functioning as a
Pastor, and Moves to Atlanta**

36.     Plaintiff Felicia Williams swears that Albert Armstrong
        "ceased to attend the church and function as a pastor sometime
        in 2017." Dkt. No. 26 ¶ 10.

37.     Defendant Jeanine Armstrong testified that around Easter
        Weekend of 2018 Albert Armstrong was in the hospital when
        Catherine Armstrong arranged for Albert Armstrong to be
        transferred to a rehabilitation facility near Atlanta.

38.    Albert Armstrong has since been moved to an assisted living facility near Atlanta and currently resides there.

**Albert Armstrong's May 5, 2018 Power of Attorney**

39.    On May 5, 2018, Albert Armstrong executed a "General Power of Attorney" appointing Defendants Yvette Clayborne and Jeanine Armstrong as his "true and lawful attorney-in-fact, to represent and act for [him]." Dkt. No. 28-4 at 1.

40.    The Power of Attorney provides that "[t]he powers herein and hereby conferred are general and my attorney-in-fact is by this power fully authorized to act in all matters and affairs in my place and stead." Id.

41.    The Power of Attorney provides that it "is executed for the purpose of expediting the transaction of all personal, business and investment affairs of mine and to permit action in my name and in my behalf with respect to any and all my property and affairs during the period of this power as fully and effectively as I might do were I present and acting." Id.

**Albert Armstrong Stops Receiving Payments from NCC**

42.    Defendant Jeanine Armstrong testified that "historically" Albert Armstrong received monthly payments from NCC.

43.    Defendant Jeanine Armstrong testified that the monthly payments were "roughly $2,000."

44. Defendant Jeanine Armstrong testified that she expected one of these payments in August 2018 but that "she didn't get it."

45. Defendant Jeanine Armstrong swears that around July 2018, Albert Armstrong "stopped receiving certain monthly payments from [NCC], which he had long been receiving." Dkt. No. 28 ¶ 15.

46. Defendant Jeanine Armstrong swears that the Board voted to make the monthly payments to Plaintiff Catherine Armstrong instead. Dkt. No. 28 ¶ 16.

47. Plaintiff Felicia Williams swears that "[t]he issues began with these Defendants when they did not receive the $2,000 payment in August 2018." Dkt. No. 26 ¶ 28.

48. It is unclear to the Court at this stage what entitles Albert Armstrong and/or his successors to continued receipt of $2,000 a month even during his absence from the pulpit. No retirement documents or other contractual evidence has been presented thus far.

49. Plaintiff Felicia Williams swears that she was called by Defendant PrimeSouth Bank in December 2018, which told her that Defendant Jeanine Armstrong was attempting to get money from NCC's bank account. Id. ¶ 60.

AO 72A
(Rev. 8/82)

50.     Plaintiff Felicia Williams testified that at some point PrimeSouth froze NCC's bank account such that no one can access it.

## August 2018 Meeting Between Carlos Williams and Albert Armstrong

51.     Carlos Williams testified that he met with Albert Armstrong at NCC in approximately August 2018 and that the meeting started off fine, but that Albert Armstrong veered off in his wheelchair at some point and fell asleep.

52.     Carlos Williams testified that the August 2018 meeting was the last time he saw Albert Armstrong.

## August 20, 2018 Board Meeting

53.     On August 20, 2018, a Board meeting was held at the house of Catherine Armstrong.  Dkt. No. 25-1 at 9.

54.     At this meeting, "Overseer Albert R. Armstrong" was noted as absent.  Id.

55.     Under the heading "Information from Attorney," the meeting minutes state that an attorney "strongly advised to remove Pastor Albert R. Armstrong from accounts and board of officers of New Covenant Church due to his daughters having complete power of attorney over him."  Id. at 10.

56.     Under "Action," the minutes state "that the information provided from the attorney was vital and urgent, the entire board agreed to start the process of removal of Pastor Albert R. Armstrong from the board of directors.  A motion was made

by Ruby Ross and Diane Eberhart seconded to approve. Motion carried." Id.

57. The minutes state that the Board members "read the steps to take according to the bylaws to start the removal procedure." Id.

58. The minutes state that "an official written notice of the next meeting to vote for the removal of Pastor Albert R. Armstrong from the board of trustees will be emailed and mailed next business day to him and his attorney-at-law." Id.

**September 18, 2018 Board Meeting**

59. On September 18, 2018, another Board meeting was held. Dkt. No. 25-1 at 6.

60. The meeting minutes noted that "Overseer Albert R. Armstrong" was absent. Id.

61. According to the minutes, Albert Armstrong was removed from the Board, but the minutes later state that Albert Armstrong's "membership and position on the Board of Directors" was temporarily paused. Id. at 7.

62. According to the minutes, the Board "collectively established the fact that Overseer Albert R. Armstrong is not where he once was as a board member due to major health issues," and that "for this reason and this reason only [the Board] will not recognize or acknowledge the Power of Attorney

AO 72A
(Rev. 8/82)

rights that Jeanine Armstrong and Yvette Clayborne-Spruill have over him." Id.

63.     According to the minutes, Cynthia Nelson was elected by the Board to the Board for a three-year term of service. Id.

64.     According to the minutes, the Board agreed to changes and amendments to the Bylaws. Id.

**The 2018 Bylaws**

65.     On September 18, 2018, the NCC Board approved new Bylaws. Dkt. No. 25-1 at 7.

**October 16, 2018 Board Meeting**

66.     On October 16, 2018, a Board meeting was held. Dkt. No. 25-2 at 27.

67.     The meeting minutes state that the Board secretary provided each present Board member with a copy of the newly amended Bylaws. Id. at 28.

**Secretary of State Documents Changed**

68.     Plaintiff Felicia Williams testified that in December 2018 she was notified by an agent of Defendant PrimeSouth Bank that Defendant Jeanine Armstrong attempted to use the Secretary of State registration seal to take money from NCC's bank account.

69.     Plaintiff Felicia Williams testified that Defendant PrimeSouth Bank did not permit Jeanine Armstrong to withdraw

AO 72A
(Rev. 8/82)

money from NCC's bank account when she attempted to in December 2018.

70.    Plaintiff Felicia Williams testified that she received an email on NCC's email account stating that NCC's Annual Registration information with the Secretary of State had been changed.

71.    Defendant's exhibit of a screen shot of NCC's Business Information page on the Secretary of State website show that NCC's Secretary of State Annual Registration information has been changed numerous times in 2019.  Dkt. No. 28-9 at 1-3.

**March 8, 2019 Termination Letter**

72.    On March 8, 2019, Defendants Jeanine Armstrong and Yvette Clayborne's attorney sent a letter to Carlos and Felicia Williams stating that "[p]ursuant to a duly executed power of attorney dated May 5, 2018, my clients are authorized and obligated to take such actions on behalf of their father as they deem necessary to protect his best interests."  Dkt. No. 12-6 at 2.

73.    The March 8 letter states that Carlos and Felicia Williams' "employment with NCC is hereby terminated effective immediately" and that they were to "immediately cease all work for and through NCC."  Dkt. No. 12-6 at 2.

AO 72A
(Rev. 8/82)

74.     The letter states that Carlos and Felicia Williams "[w]ithout any authority or justification, [ ] unilaterally decided to withhold monies due to Mr. Armstrong." Id.

**Defendant Sisters Lockdown the Church**

75.     Defendant Jeanine Armstrong testified that at some point she and Defendant Yvette Clayborne decided to "lock down" the church.

76.     Defendant Jeanine Armstrong testified that she and Yvette Clayborne are not members of NCC or its Board.

77.     Defendant Jeanine Armstrong testified that her intentions on March 9, 2019, were to lock up NCC.

78.     Cynthia Nelson testified that she went to NCC on March 9, 2019, because she had learned that Defendants Yvette Clayborne and Jeanine Armstrong intended to "clear" the church.

79.     Cynthia Nelson took video footage on that day that shows a row of cars backed up to a door of NCC's building blocking view of the activities. Visible is, primarily, the feet of people moving in-and-out of NCC's building.

80.     Cynthia Nelson testified that Defendants Yvette Clayborne and Jeanine Armstrong, two of Albert and Catherine Armstrong's grandsons, and a girlfriend of one of the grandsons were at NCC that day, and that none of these identified people were or are members of NCC.

81. Defendant Jeanine Armstrong testified that Albert Armstrong, wheelchair bound, was also at NCC that day.

82. Defendant Jeanine Armstrong testified that she and others at NCC that day did not take anything from NCC that they kept, but that they only took documents, made copies of those documents, and then returned them.

83. Cynthia Nelson testified that an officer of the Brunswick Police Department told her that she, Nelson, was not allowed on NCC's property.

84. Cynthia Nelson testified that those who worship at NCC have been worshipping at another location.

85. Plaintiff Carlos Williams testified that he had not been on NCC's property since March 9, 2019, because he was told (by whom it is not clear) that he would be arrested if he did.

86. Plaintiff Catherine Armstrong testified that she was at NCC that day and that Defendant Officer Futch of the Brunswick Police Department told her that she would be "locked up" if she entered NCC's property.

87. Plaintiff Catherine Armstrong testified that since March 9, 2019, she has not returned to NCC because of Defendant Officer Futch's threat of arrest.

**April 5, 2019 Evaluator's Report**

88.     On April 5, 2019, Albert Armstrong was evaluated for competency in connection with a different legal matter. Dkt. No. 28-10.

89.     The evaluator determined that Albert Armstrong was "incapacitated by reason of dementia and [left] sided [illegible]." <u>Id.</u> at 2.

90.     Specifically, the evaluator found that Albert Armstrong lacked "sufficient capacity to make or communicate significant responsible decisions concerning his or her health or safety," <u>id.</u>, and that he lacked "sufficient capacity to make or communicate significant responsible decisions concerning the management of his or her property," <u>id.</u>

**Additional Sworn Statements by Plaintiff Felicia Williams**

91.     Plaintiff Felicia Williams swears that in 2017 the Board met at Albert Armstrong's home for some time because of the difficulty in Albert Armstrong attending meetings elsewhere. Dkt. No. 26 ¶¶ 19, 20.

92.     Plaintiff Felicia Williams swears that Albert Armstrong only attended two of the Board meetings at his house in 2017, but that his inability to focus and "unfiltered outbursts" caused the Board to stop meeting at Albert Armstrong's house. <u>Id.</u> ¶¶ 20, 21.

AO 72A
(Rev. 8/82)

93.    Plaintiff Felicia Williams swears that the last Board
meeting at Albert Armstrong's house in 2017 was the last NCC
Board meeting that he attended.  Id. ¶ 22.

94.    Plaintiff Felicia Williams swears that she last saw
Albert Armstrong when she visited him at a medical facility
in 2017, and that he consistently did not "recognize some of
us and had hallucinations."  Id. ¶ 24.

**CONCLUSIONS OF LAW**

**I. Temporary Restraining Order**

Under Federal Rule of Civil Procedure 65(b), courts may issue
a temporary restraining order without notice to the adverse party
only if:

> (A) specific facts in an affidavit or a verified complaint
> clearly show that immediate and irreparable injury, loss,
> or damage will result to the movant before the adversary
> party can be heard in opposition; and
> (B) the movant's attorney certifies in writing any efforts
> made to give notice and the reasons why it should not be
> required.

Because Defendant received notice of this action and the Motion
for a Temporary Restraining Order, Plaintiff's request for a
temporary restraining order is now **MOOT** and is due to be **DENIED**.
See Chavez v. Fla. SP Warden, 742 F.3d 1267, 1271 n.3 (11th Cir.
2014) ("Because notice was given to the party opposing the motion
for a restraining order and an evidentiary hearing has been held,
the motion for a restraining order is moot or, if one prefers, the

AO 72A
(Rev. 8/82)

issues involving it are merged into the motion for a preliminary injunction.").

## II. Preliminary Injunction

"A preliminary injunction is appropriate if the movant demonstrates all of these elements: (1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest." Chavez, 742 F.3d at 1271 (citation omitted). "'[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the burden of persuasion' as to each of the four prerequisites." Siegel v. LePore, 234 F.3d 1163, 1176-77 (11th Cir. 2000) (quoting McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998)).

## A. Claims Against Defendant Sisters, Yvette Clayborne and Jeanine Armstrong

Plaintiffs seek a preliminary injunction against Defendants Yvette Clayborne and Jeanine Armstrong ("Defendant Sisters" or "Sisters") based on Plaintiffs' claims of conversion, trespass, and declaratory judgment. The gravamen of the Complaint and the Motion is that Defendant Sisters do not have control over NCC by means of Albert Armstrong appointing the Sisters as his attorneys-

in-fact, as Defendant Sisters contend. Defendant Sisters counter that they do indeed control NCC because under the 1989 Bylaws Albert Armstrong is the only legitimate member of NCC, and that the current, purported Board was never properly constituted under the 1989 Bylaws and as such, all of its actions are voidable.

## 1. Substantial Likelihood of Success on the Merits

Defendant Sisters argue that Albert Armstrong is the sole member of NCC and that the current Board is not constituted in accordance with the 1989 Bylaws such that their actions are voidable. Specifically, they argue that the 1989 Bylaws provide: that the incorporators of the church "shall be the first members of the Corporation," dkt. no. 28 ¶ 8 (quoting dkt. no. 25-1 at 59); that "[a]ny or all of the members of the Board of Trustees may be removed with or without cause by vote of the members of the Corporation," id. ¶ 9 (quoting dkt. no. 25-1 at 64); that Albert Armstrong is the only current member of NCC; and that the Bylaws may be altered or repealed only "by a majority vote of the members [of the church corporation] entitled to vote in the election of directors," id. ¶ 11 (alteration in original) (quoting dkt. no. 25-1 at 66). Thus, Defendant Sisters argue that Albert Armstrong is currently the only member of NCC and that the 2018 Bylaws were not adopted by him, so they cannot be valid. Further, they argue that Albert Armstrong's removal by the Board on September 18 was

not valid because the Board was not properly constituted in accordance with the 1989 Bylaws.

NCC was incorporated pursuant to the Georgia Nonprofit Corporation Code and as such, is governed by the Code, O.C.G.A. § 14-3-101 *et seq.* The Code provides that "[e]ach corporation must have a board of directors." O.C.G.A. § 14-3-801(a). "A board of directors must consist of one or more natural persons, with the number specified in or fixed in accordance with the articles or bylaws." O.C.G.A. § 14-3-803. The 1989 Bylaws provide that "the number of Trustees constituting the entire Board shall be no less than three." Dkt. No. 25-1 at 63. Further, the Code provides that "[e]xcept as provided in this chapter . . . all corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation managed under the direction of, its board." O.C.G.A. § 14-3-801(b). Finally, that Code section also provides that "[t]he articles may authorize a person or persons to exercise some or all of the powers which would otherwise be exercised by a board." O.C.G.A. § 14-3-801(d). NCC's Articles provide that "[t]he affairs of the Corporation shall be managed by a Board of Trustees." Dkt. No. 25-1 at 70. While the Board exercises "all corporate powers" and manages "the business and affairs" of NCC, O.C.G.A. § 14-3-801(b), the chief executive officer, unless the "articles, bylaws, or a resolution of the board of directors of the corporation provides otherwise," has the

AO 72A
(Rev. 8/82)

"authority to conduct all ordinary business on behalf of the corporation." O.C.G.A. § 14-3-841.

Assuming *arguendo* that Albert Armstrong was the chief executive officer of NCC, based on this record and under the 1989 Bylaws he is no longer. The 1989 Bylaws state that "[t]he Chairman of the Board of Trustees shall be the chief executive officer of the Corporation, shall have the responsibility of the general management of the affairs of the Corporation, and shall carry out the resolutions of the Board of Trustees." Dkt. No. 25-1 at 65. The 1989 Bylaws further provide that "[d]uring the absence or disability of the Chairman of the Board of Trustees, the Secretary shall have all the powers and functions of the President." Id. at 66. The current record shows that Albert Armstrong is both absent from NCC and disabled. Thus, assuming *arguendo* that the Board's actions removing him from the Board and as Chairman and adopting the 2018 Bylaws are voidable, Albert Armstrong is still absent and disabled and thus cannot exercise the functions of Chairman of the Board of Trustees and of chief executive officer. Because Albert Armstrong does not have these powers, Defendant Sisters cannot either.

Further, even if Albert Armstrong were still Chairman of the Board and chief executive officer and even if Defendant Sisters could act in Albert Armstrong's stead as Chairman of the Board of Trustees, the Court finds on this record that the acts of changing

21

the locks on the church, controlling NCC's bank accounts, and refusing admittance on NCC's property to longtime NCC churchgoers are not acts of "general management" within the meaning of the 1989 Bylaws. As such, these acts are outside of the powers of a chief executive officer, unless they are permitted by "resolutions of the Board of Trustees." Dkt. No. 25-1 at 65. In summation, Albert Armstrong is no longer the Chairman of the Board and the chief executive officer because he is both absent and disabled. Even if he were present and fully able, he could not have undertaken many of the acts that the Defendant Sisters have taken.

Additionally, under the Code, the Articles, and the 1989 Bylaws, Albert Armstrong does not have the power to control NCC even if he is the only member of the corporation—only the Board has that power. The Code requires a nonprofit corporation to have a board that shall exercise all corporate powers, with some exceptions that do not apply here. The Articles state that the affairs of NCC are to be managed by a Board. Further, the 1989 Bylaws state that the Board must consist of at least three members. Thus, generally speaking, a Board consisting of at least three members controls the affairs of NCC.

Defendants argue that the current Board was not properly constituted such that their acts are voidable and should be voided. At this stage of the case, a crucial issue is whether Defendant Sisters wield the power to control NCC's property. Under the

present record, they do not. Even assuming *arguendo* that Albert Armstrong is the only member of NCC, and that by virtue of the Power of Attorney that the Sisters can exercise all powers that Albert Armstrong possesses, these powers cannot include controlling the property of NCC because only a three-member (or more) Board can do that. Therefore, even if NCC does not have a Board that was elected in accordance with the 1989 Bylaws,[1] that does not mean that Albert Armstrong and Defendant Sisters have unfettered control over NCC: the Code and Articles dictate that only the Board has such control, whether it properly exists or not. For these reasons, based on the present record Defendant Sisters do not have the power to control NCC and their acts to control NCC's property were and are *ultra vires*.

For these reasons, Plaintiffs have shown a substantial likelihood of success on the merits on their claims against Defendant Sisters.

---

[1] This is a curious contention considering that several members of the current Board served on the Board with Albert Armstrong. For example, meeting minutes for a November 15, 2016 NCC Board meeting show that Albert Armstrong presided over the meeting. See Dkt. No. 25-3 at 4. The minutes marked Felicia Williams, Cathy Armstrong, Phillip Nobles, Diane Eberhart, and Ruby Ross as Board members—five members of the current Board. Thus, Defendant Sisters would have the Court find that the very Board that Albert Armstrong presided over was in fact not a Board at all but was powerless to take any actions on behalf of NCC. The Court, however, need not make this determination at this stage.

## 2. Irreparable Harm

Plaintiffs must show that irreparable harm is not merely possible, but likely. See Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 22 (2008) (rejecting "possibility" standard as too lenient: "[o]ur frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction"). "An injury is 'irreparable' only if it cannot be undone through monetary remedies." Ferrero v. Associated Materials, Inc., 923 F.2d 1441, 1447 (11th Cir. 1991) (citation omitted). Here, Plaintiffs have made the required showing. The affairs of NCC have been severely hampered by Defendant Sisters' actions. The regular attendees of NCC, along with the senior pastor appointed by Albert Armstrong himself, have been unable to conduct NCC's worship services, bible studies, and events on NCC's property. Plaintiffs' inability to utilize church property cannot be remedied by money and is severely impacting NCC's ability to operate. For these reasons, Plaintiffs have satisfied their burden.

## 3. Balance of Hardships

Defendant Sisters have intervened in the affairs of NCC in an attempt to restore a monthly payment of roughly $2,000 that had historically been paid by NCC to Albert Armstrong. The Court has been provided with no record evidence evincing that Albert

Armstrong is contractually or legally entitled to such payments. Accordingly, any harm to Defendant Sisters is outweighed by the threatened injury to Plaintiffs if they are not able to use NCC's property for its intended purposes—worshipping and related church activities. Further, even if Albert Armstrong were entitled to such payments, these monetary payments are compensable, but the threatened, irreparable injury to Plaintiffs not being able to use NCC's property is not. For these reasons, the balance of the hardships weighs in Plaintiffs' favor.

### 4. Public Interest

Finally, the Court finds that granting this Preliminary Injunction against Defendant Sisters is not averse to any public interest. The Court is unable to discern the public harm in permitting churchgoers to worship on the property of the church of which they have worshipped for years.

### 5. Conclusion

For these reasons, Plaintiffs' Motion for Preliminary Injunction against Defendants Yvette Clayborne and Jeanine Armstrong is due to be **GRANTED** as outlined below.

### B. Defendant PrimeSouth Bank

This Motion only seeks an injunction requiring Defendant PrimeSouth Bank to unfreeze NCC's accounts. The Motion is due to be **GRANTED** to the extent that Plaintiffs are entitled to remove $4,000 from NCC's account with Defendant PrimeSouth Bank to place

AO 72A
(Rev. 8/82)

into the registry of the Court as bond. The attorneys for each side are **ORDERED** to meet and confer in order to agree upon a format for accessing funds to pay for expenses during the 90 days that this Preliminary Injunction is in place. The agreement shall be filed on the record in this case within 10 days.

## C. Defendant Police Officers

The Court finds that the public interest is so strongly in favor of not enjoining Defendant Police Officers from responding to NCC property for any reason that any request for an injunction against them must fail. Thus, the Motion with respect to Defendant Police Officers is due to be **DENIED**.

### CONCLUSION

For the reasons stated, Plaintiffs' Motion for a Temporary Restraining Order, dkt. no. 12, is **DENIED as moot**. Plaintiffs' Motion for Preliminary Injunction, id., is **GRANTED in part and DENIED in part** as follows:

> 1. To the extent Defendant Sisters have changed any locks at NCC, the Court orders Defendants Yvette Clayborne and Jeanine Armstrong to remove and replace any changed locks on NCC's property with the original locks within fourteen days of this Order and to give all keys to the original locks that Defendants Yvette Clayborne and Jeanine Armstrong have to Plaintiffs' attorney.

AO 72A
(Rev. 8/82)

2. The Court orders Defendants Yvette Clayborne and Jeanine Armstrong to remove or cause to be removed by a third-party any security or monitoring equipment they may have installed or caused to be installed on NCC property within fourteen days of this Order.

3. The Court prohibits Defendants Yvette Clayborne and Jeanine Armstrong from attempting to hinder or block anyone from entering NCC's property.

4. The Court prohibits Defendants Yvette Clayborne and Jeanine Armstrong from attempting to access NCC's bank account(s).

5. The Court prohibits Defendants Yvette Clayborne and Jeanine Armstrong from amending NCC's corporate information with the Georgia Secretary of State's office—including but not limited to the Annual Registration.

6. The Court orders Defendant PrimeSouth Bank to unfreeze NCC's accounts for the limited purposes set forth in II.B. of this Order.

7. Until further order of the Court, the Court orders Plaintiffs to deposit $4,000 into the registry of the United States District Court as a security bond pursuant to Federal Rule of Civil Procedure 65(c). The bond must be posted by May 15, 2019.

AO 72A
(Rev. 8/82)

8. The Court orders the attorneys for each side to meet and confer in order to agree upon a format for accessing funds to pay for expenses during the 90 days that this Preliminary Injunction is in place. The agreement shall be filed on the record in this case within 10 days.

9. This Preliminary Injunction shall be in place for 90 days from the date of this Order.

**ORDERED**, this 1st day of May, 2019.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)