# In the United States District Court for the Southern District of Georgia Brunswick Division

NEW COVENANT CHURCH, INC., et al.,

    Plaintiffs,

    v.

CARLA FUTCH, et al.,

    Defendants.

No. 2:19—CV-40

## ORDER

Before the Court is Defendants' Motion for Summary Judgment (the "Motion"). Dkt. No. 96. For the reasons stated below, Defendants' Motion is **GRANTED**.

### I.   BACKGROUND[1]

This case arises from two feuding family factions which both lay claim to a small church in Brunswick, Georgia, one faction's exclusion of the other from the church for a period of time, and several Brunswick police officers' role in that exclusion. Albert Armstrong ("Mr. Armstrong"), husband of Catherine Armstrong ("Mrs. Armstrong") and father to Jeanine Armstrong and Yvette Clayborne

---

[1] The material facts set forth in Defendants' Statement of Undisputed Material Facts, dkt. no. 96-2, are deemed admitted for the purposes of this Motion, as Plaintiffs do not specifically deny any of them. See Dkt. No. 106-2; S.D. Ga. LR 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by a statement served by the opposing party.").

(the "Armstrong sisters"), incorporated Plaintiff New Covenant Church, Inc. ("New Covenant") in 1989 and served as its pastor and chief executive officer until December 2016, when he began to experience health issues.  Dkt. No. 96-2 ¶¶ 1–3.  Between January 2017 and spring of 2018, Mr. Armstrong "pass[ed] the mantle" of lead pastor to Plaintiff Carlos Williams ("Mr. Williams"), Mr. Williams was installed as lead pastor, and Mr. Armstrong stopped attending services at New Covenant.  Id. ¶¶ 5–8.  Mrs. Armstrong struggled to care for the ailing Mr. Armstrong in their home, and she arranged for her husband to move to a rehabilitation facility near the Armstrong sisters in Atlanta in spring of 2018.  Id. ¶¶ 4, 8.  In May 2018, Mr. Armstrong executed a plenary power of attorney in favor of the Armstrong sisters.  Id. ¶ 10.  In August 2018, a dispute arose regarding the payment for Mr. Armstrong's care at the rehabilitation facility, which instigated a series of "long-distance financial and legal tussles for control of the church" between the Armstrong sisters acting on Mr. Armstrong's behalf on one side, and Mrs. Armstrong and the other church leadership on the other.  Id. ¶¶ 11 –14.

On March 2, 2019, Captain Wan Thorpe ("Captain Thorpe") with the Brunswick Police Department was notified by a Glynn County officer that someone sought to arrange employment of an off-duty officer for a job in Brunswick.  Id. ¶ 16.  Captain Thorpe called the number with which he had been provided and spoke with one of

the Armstrong sisters, Yvette, who told him that her father owned a church in Brunswick; "the people in the church had been evicted"; and she sought an officer to stand by while the locks on the church building were changed. Id. ¶¶ 17-18. Captain Thorpe quoted Yvette the hourly rate for an off-duty officer and told her: "as long as you have all your paperwork and everything in order[,] we can take care of it." Id. ¶ 19. Captain Thorpe testified that he did not personally request or review any paperwork from Yvette, but that he intended for Yvette to bring documentation of ownership to the property on the day of the off-duty assignment. Id. ¶ 20. After notifying a pool of Brunswick officers who signed up for opportunities to perform off-duty work about the available assignment, Captain Thorpe randomly selected Officer Carla Futch ("Officer Futch") from those who responded. Id. ¶ 23. Officer Futch testified that Captain Thorpe told her where and when to report for the assignment, and that the woman who had requested the off-duty watch "would be telling [Officer Futch] who was going to be allowed at the property because they were locking the building up." Id. ¶ 24.

**Events of March 9, 2019**

A little before nine o'clock A.M. on March 9, 2019, Officer Futch reported to New Covenant for the off-duty assignment. Id. ¶ 26; Dkt. No. 110-1 at 49. Officer Futch was off duty but in uniform, which included a polo shirt and a badge with her name

printed on it; her firearm; and her police vehicle, which was
unmarked.  Dkt. No. 96-2 ¶ 26; Dkt. No. 110-1 at 9, 32; Dkt. No.
110-6 at 17.  The church building was already unlocked when Officer
Futch arrived, and she met the Armstrong sisters at that time.
Dkt. No. 96-2 ¶ 27.  One of the Armstrong sisters told Officer
Futch that "only the few people who were already at the church
. . . , and a locksmith who was en route, were to be allowed inside
the building that day."  Id. ¶ 28.  The New Covenant leadership
"caught wind that the Armstrong sisters were coming to town to
attempt to secure the church property," so a New Covenant Board
member, Plaintiff Cynthia Nelson ("Ms. Nelson"), drove by the
church at some point that morning.  Id. ¶ 31; Dkt. No. 110-1 at
14.  Ms. Nelson saw the Armstrong sisters and Officer Futch at the
church property, parked her car and approached the doors of the
church, and was told by Officer Futch that she could not enter.
Dkt. No. 96-2 ¶¶ 32-33.  Officer Futch testified that she told Ms.
Nelson that if Ms. Nelson continued to attempt to come onto the
church property, Officer Futch would arrest her for criminal
trespass.  Dkt. No. 110-1 at 16.  Despite Officer Futch's being in
uniform, Ms. Nelson went to a neighbor's house to call 911 and
report that someone was impersonating a police officer; Ms. Nelson
also called Mrs. Armstrong to tell her that her daughters were at
the church.  Dkt. No. 96-2 ¶¶ 34-35; Dkt. No. 110-1 at 36.  When
Ms. Nelson got back to the church, an on-duty police officer named

4

Sergeant English had arrived to respond to her call and had spoken with Officer Futch.  Dkt. No. 110-1 at 35; Dkt. No. 96-2 ¶ 36. Mrs. Armstrong and other church members began to arrive at the scene, and at least one member argued with Officer Futch about their not being able to come onto the property.  Dkt. No. 110-1 at 17–18; Dkt. No. 96-2 ¶ 38.  The church members gathered in an empty lot across the street from the church, and they made several 911 calls reporting verbal altercations and trespassing.  Dkt. No. 96-2 ¶ 39; Dkt. No. 110-2 at 7–8.  At some point, Officer Futch told the church members to leave the lot across the street from the church, so the members moved to a park that was adjacent to that lot.  Dkt. No. 100-1 at 22.

Next to arrive on the scene were Defendants Sergeant Shawn Ferguson ("Sergeant Ferguson") and Officer Ricky Hall ("Officer Hall").  Dkt. No. 96-2 ¶ 40.[2]  Sergeant Ferguson spoke with Officer Futch, who told him she had been hired for this off-duty assignment and instructed by the Armstrong sisters not to let any of the people assembled across the street into the building.  Id. ¶ 41. Sergeant Ferguson next spoke with the church members in the park, who presented him with a manila folder full of documents that they contended showed they were the rightful owners of the church.  Id.

---

[2] Officer Hall also testified that another Brunswick police officer named Stacy Durham was on the scene when he arrived.  Dkt. No. 110-3 at 14.  Officer Durham is not mentioned anywhere else in the record and is not a named defendant in this case.

¶ 42; Dkt. No. 110-2 at 14.   Sergeant Ferguson briefly looked at the documents, told the church members to wait, and then met with the Armstrong sisters, who showed him the power of attorney that they contended allowed them to secure the building.   Dkt. No. 96-2 ¶¶ 43-44; Dkt. No. 110-2 at 15.   Presented with these competing documents and claims of ownership, Sergeant Ferguson said "well, this is where I stop."   Dkt. No. 96-2 ¶¶ 45-46.   Sergeant Ferguson told both sides that this was a civil issue which they would have to take to court to figure out.   Id. ¶ 46; Dkt. No. 110-2 at 18. Sergeant Ferguson told the Armstrong sisters to finish locking the doors and not to take or disturb anything; the sisters assured him that is all they intended to do.   Dkt. No. 110-2 at 19, 21; Dkt. No. 96-2 ¶¶ 49-50.   Sergeant Ferguson was on the scene for about twenty minutes in total that day and testified that all of the parties seemed to agree on the resolution he proposed.   Dkt. No. 110-2 at 25.   Officer Hall spoke with one church member who explained the dispute to him, and he likewise told that member that it was a civil matter that needed to be resolved in court. Dkt. No. 110-3 at 15-16.   Officer Hall essentially relied upon Sergeant Ferguson's judgment that the dispute was a civil matter. Id. at 19.

Officer Futch remained on the scene until the church building was secured and everyone inside had departed, which was about three or four o'clock that afternoon.   Dkt. No. 96-2 ¶ 54.   Officer Futch

testified that she was outside standing by her car for most of the time she was on the scene; that she only went inside once to use the restroom; and the only thing she saw the Armstrong sisters remove from the church was a stack of empty boxes and some trash. Dkt. No. 110-1 at 24, 46, 49.  Ms. Nelson remembers things somewhat differently; she testified that she watched the scene all day, and Officer Futch was in her vehicle the whole time except for once or twice when someone came up to speak with her.  Dkt. No. 100-1 at 24.  Ms. Nelson says she saw the Armstrong sisters remove at least two boxes from the church and put the boxes in their vehicles. Dkt. No. 100-1 at 24, 26-27.  Ms. Nelson does not know what was in those boxes.  Id. at 27.  At the temporary restraining order hearing, Jeanine Armstrong testified that she and her sister took the church's by-laws and Board meeting minutes to make copies, but that they returned these documents later and did not take anything else.  Dkt. No. 95 at 88.

**Aftermath of March 9**

From March 11, 2019 on, the Brunswick Police Department implemented an "extra watch" on the New Covenant property.  Dkt. No. 96-1 ¶ 57.  An extra watch involves informing all officers that no one is permitted to be on a certain property; anyone seen on the property is to be stopped, asked for identification including name and date of birth, run through databases to check for warrants, and then ordered to stay off the property.  Id.

¶¶ 58–59.  This extra watch for New Covenant was to be in place until further notice.  Id. ¶ 58.  While the church was closed, a nearby church allowed the New Covenant congregation to use its facility for Sunday services and bible study, free of charge.  Id. ¶ 61.  Most of the church's core group of thirty-five to forty-five members attended services at this alternate location, and New Covenant collected offering as usual during this time.  Id. ¶ 62.

On March 15, 2019, Plaintiffs—then consisting of New Covenant, Mr. Williams, Felicia Williams (Mr. Williams's wife), "individually and on behalf of others similarly situation," and Mrs. Armstrong—filed this suit in Glynn County Superior Court. Id. ¶ 63; Dkt. No. 1-1.  Plaintiffs originally sought damages; equitable, injunctive, and declaratory relief; a temporary restraining order; and preliminary and permanent injunctions against then-defendants the Armstrong sisters, Officer Futch, Sergeant Ferguson, and an unknown officer, as well as Global Locksmith Pros, LLC and PrimeSouth Bank.  Dkt. No. 1-1 at 1. Defendants removed the case to this Court on March 21, 2019, on the basis of federal question jurisdiction.  Dkt. No. 1. Plaintiffs filed their first amended complaint on April 4, 2019. Dkt. No. 12.  In their first complaints, Plaintiffs sought, inter alia, an order from the Court enjoining the Armstrong sisters from keeping New Covenant closed; declaring that the New Covenant members were the church's rightful owners; and enjoining the police

officer defendants from entering onto New Covenant's property. Dkt. No. 12 at 30–31. Plaintiffs moved to dismiss Defendant Global Locksmith on April 4th, which the Court later granted. Dkt. Nos. 13, 23.

On April 18, 2019, the Court held a hearing on Plaintiffs' motion for a temporary restraining order and preliminary injunction, at which the parties called several witnesses, including the Armstrong sisters, Ms. Nelson, Mr. Williams, and Mrs. Armstrong. Dkt. No. 23. The Court orally denied the temporary restraining order as to the police officers at the hearing. Id. at 2. In a written opinion on May 1, 2019, the Court granted the motion for preliminary injunction against the Armstrong sisters, finding that the sisters "d[id] not have the power to control [New Covenant] and their acts to control [New Covenant]'s property were and are ultra vires." Dkt. No. 29 at 23, 25. Among other things, the Court ordered the Armstrong sisters to remove and replace the locks on New Covenant's property within fourteen days. Id. at 26–27.

**Events of May 11, 2019**

At 7:37 a.m. on May 11, 2019—ten days after the Court granted Plaintiffs' motion for a preliminary injunction—Defendant Samantha Spaulding, a Brunswick Police Officer, ("Officer Spaulding") was on duty and passing by New Covenant Church, when she noticed a

woman looking into the church and pulling on the door handles.[3]
Dkt. No. 96-2 ¶ 69; Dkt. No. 110-4 at 12.  Officer Spaulding knew
there was an extra watch in place on the New Covenant property, so
she got out of her car to obtain the woman's identifying
information and run it through the databases to search for warrants
and criminal trespass warnings.  Dkt. No. 96-2 ¶¶ 68, 70.  The
woman identified herself as Cynthia Nelson and presented a copy of
the Court's May 1st order, but she refused to give Officer
Spaulding her date of birth.  Id. ¶ 71.  Officer Spaulding and Ms.
Nelson went back and forth about the necessity of Ms. Nelson's
providing her date of birth, and Ms. Nelson accused Officer
Spaulding of harassing Ms. Nelson.  Id. ¶ 72, 74; Dkt. No. 110-4
at 23.

Officer Spaulding called her supervisor, Defendant Sergeant
Chad Henley ("Sergeant Henley"), to come help explain to Ms. Nelson
why she needed to provide her date of birth.  Dkt. No. 96-2 ¶ 74.
Incidentally, Sergeant Henley had grown up in New Covenant Church
and is the stepbrother of Mr. Williams; he recognized Ms. Nelson
from his attending New Covenant over twenty years ago.  Id. ¶ 75;
Dkt. No. 110-5 at 22.  Sergeant Henley arrived shortly thereafter,
did not tell Officer Spaulding that he knew Ms. Nelson, and

---

[3] Ms. Nelson stated in her deposition that they opened the church back up on
May 10, 2019, dkt. no. 110-1 at 34-35, but it seems she was either mistaken as
to this date or she did not have the keys on May 11, 2019, when she was pulling
on the church's door handles to no avail.

explained to Ms. Nelson that she was required to provide her date of birth. Dkt. No. 96-2 ¶ 77–78. Ms. Nelson complied. Id. ¶ 79. Officer Spaulding then ran Ms. Nelson's information through the databases, determined that Ms. Nelson had no outstanding warrants or criminal trespass warnings, and told Ms. Nelson that she was free to leave. Id. The entire interaction—from Officer Spaulding's approaching Ms. Nelson until Officer Spaulding departed the scene—lasted approximately fifteen minutes. Id. ¶ 80.

## Aftermath of May 11

On June 19, 2019, the Magistrate Judge mediated a settlement conference at which Plaintiffs and the Armstrong sisters reached a settlement. Dkt. No. 40 at 1. The Armstrong sisters and PrimeSouth Bank were subsequently voluntarily dismissed, dkt. nos. 46, 48, leaving only the police officer defendants remaining. Plaintiffs—now including Ms. Nelson—then filed their second amended complaint on December 10, 2019, naming as defendants Officer Futch, Sergeant Ferguson, Officer Spaulding, Sergeant Henley, and Brunswick, Georgia. Dkt. No. 58. Plaintiffs thereafter sought and obtained leave to amend their complaint two more times, ending in the current complaint (the "Fourth Amended Complaint") on May 28, 2020. Dkt. Nos. 64, 67, 70, 71. Plaintiffs now consist of New Covenant, Mr. Williams, Mrs. Williams, Mrs. Armstrong, and Ms. Nelson, individually and on behalf of others

similarly situated, and Defendants now consist of Officer Futch, Sergeant Ferguson, Officer Hall, Officer Spaulding, and Sergeant Henley, in their individual and official capacities as police officers for the city of Brunswick, Georgia. Dkt. No. 71. Defendants moved to dismiss any class claims asserted in Plaintiffs' Fourth Amended Complaint on June 26, 2020, which the Court later granted. Dkt. Nos. 75, 115. Plaintiffs sought to amend their complaint for a fifth time on June 29, 2020, but the Court denied that motion. Dkt. Nos. 77, 90.

All that remains of the case at this point is a First Amendment claim and a Fourteenth Amendment claim against Defendants Futch, Ferguson, and Hall;[4] a Fourth Amendment and false imprisonment claim against Defendants Spaulding and Henley;[5] and a declaratory judgment claim against the Armstrong sisters, who are no longer named defendants in this case. Dkt. No. 71. The parties attended a settlement conference with the Magistrate Judge on September 8, 2020, and the parties failed to reach a settlement. Dkt. No. 92. Defendants filed the present Motion for Summary Judgment on September 22, 2020. Dkt. No. 96. The Court held a

---

[4] Plaintiffs state in their response to Defendants' Motion for Summary Judgment that they "withdraw their trespass claim" against Defendants Futch, Ferguson, and Hall. Dkt. No. 106-1 at 16.

[5] Plaintiffs stated at the hearing on Defendants' Motion for Summary Judgment that they were abandoning their Fifth Amendment claims against Defendants Spaulding and Henley. Further, Plaintiffs state in their response that they "do[ ] not set forth any claim against . . . any Defendant in his or her official capacity." Id. at 17.

hearing on the Motion on January 20, 2021.  Dkt. No. 114.  The
Motion has been fully briefed and is now ripe for review.  Dkt.
Nos. 106, 107.

## II.  LEGAL STANDARD

Summary judgment "shall" be granted if "the movant shows that
there is no genuine dispute as to any material fact and that the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(a).  A dispute is "genuine" where the evidence would allow
"a reasonable jury to return a verdict for the nonmoving party."
FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir.
2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986)).  A fact is "material" only if it "might affect the outcome
of the suit under the governing law."  Id. (quoting Anderson, 477
U.S. at 248).  Factual disputes that are "irrelevant or
unnecessary" are insufficient to survive summary judgment.
Anderson, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating
the absence of a genuine issue of material fact.  See Celotex Corp.
v. Catrett, 477 U.S. 317, 323 (1986).  The movant must show the
court that there is an absence of evidence to support the nonmoving
party's case.  See id. at 325.  If the moving party discharges
this burden, the burden shifts to the nonmovant to go beyond the
pleadings and present affirmative evidence to show that a genuine
issue of fact does exist.  See Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)).  Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117.  Where the nonmovant attempts to carry this burden with nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

### III. DISCUSSION

Plaintiffs assert different sets of claims against different sets of individuals, so the Court will proceed by addressing each set of individuals in turn: first, the claims asserted against Officer Futch, Sergeant Ferguson, and Officer Hall; second, the claims asserted against Officer Spaulding and Sergeant Henley; and third, the claim asserted against the Armstrong sisters.

## A. Defendants Futch, Ferguson, and Hall

### 1. First Amendment Claim

Plaintiffs allege that Defendants Futch, Ferguson, and Hall violated Plaintiffs' First Amendment rights to free exercise of religion under 42 U.S.C. § 1983 ("section 1983") by: allowing nonmembers of New Covenant to seize and lock it down for ten weeks; threatening to arrest New Covenant members who entered the property; preventing New Covenant members from worshipping; and permitting the Armstrong sisters and others to steal New Covenant's property. Dkt. No. 71 ¶¶ 48-49.[6] Defendants disagree, and they contend that Defendants Futch, Ferguson, and Hall are entitled to qualified immunity regardless. Dkt. No. 96-1 at 20-22. Because qualified immunity would shield Defendants from liability, the Court addresses this argument first.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 232 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To be entitled

---

[6] Plaintiffs also allege that these officers "active[ly] imped[ed] . . . the church's worship" by ignoring Plaintiffs' requests for extra watches before the March 9, 2019 incident. Dkt. No. 106-1 at 13. However, no evidence suggests that *these* named Defendants were responsible for taking or responding to these "extra watch" requests; Plaintiffs admitted this at the January 20th Motion hearing.

to qualified immunity, a government official must first demonstrate that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Rich v. Dollar, 841 F.2d 1558, 1563–64 (11th Cir. 1988) (citations omitted).  An official "can prove he acted within the scope of his discretionary authority by showing 'objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority.'"  Id. at 1564 (quoting Barker v. Norman, 651 F.2d 1107, 1121 (5th Cir. 1981)).

If a defendant satisfies this burden, then the Court must grant qualified immunity unless the plaintiff can demonstrate: (1) that the defendant's alleged actions violated a constitutional or statutory right; and (2) that such a right was clearly established. Bogle v. McClure, 332 F.3d 1347, 1355 (11th Cir. 2003).  Courts have the discretion to determine which of these two prongs it will address first. See Pearson, 555 U.S. at 232; see also Williams v. Russo, 636 F. App'x 527, 532 (11th Cir. 2016).

The threshold question for qualified immunity is whether these Defendants were acting within the scope of their discretionary authority when the allegedly wrongful acts occurred. Rich, 841 F.2d at 1564.  Neither party disputes that Defendants Futch, Ferguson, and Hall were acting within their discretionary authority during the events in question.  Officer Futch was on the

scene on March 9, 2019, as an off-duty police officer; however, she was in uniform, including a badge with her name on it, and she admitted that she was performing "a police function" when she was there.  Dkt. No. 110-1 at 33.  Sergeant Ferguson and Officer Hall were also clearly performing their functions as police officers; they were dispatched to the scene because of a 911 call, and they were responding to that call when they arrived and spoke with the parties.  Dkt. No. 96-2 ¶ 40.

Because Defendants Futch, Ferguson, and Hall were acting within their discretionary authority, they are entitled to qualified immunity if their actions did not violate (1) a constitutional right (2) that was clearly established at the time of the actions.  Plaintiffs argue that these Defendants' allowing the Armstrong sisters to lock up the church prevented Plaintiffs from worshipping there from March 9, 2019 until May 10, 2019,[7] which infringed upon Plaintiffs' First Amendment right to free exercise of religion.  Defendants argue "there is no evidence that Defendants' actions were motivated in any way by the [Plaintiffs'] religious activity."  Dkt. No. 106 at 6.

The First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]."  U.S. Const. amend. I.  It is clear "that the First Amendment protects the right

---

[7] Ms. Nelson's testified that they opened the church back up on May 10, 2019. See Dkt. No. 100-1 at 34–35

to pray," because "prayer unquestionably constitutes the 'exercise' of religion." Sause v. Bauer, 138 S. Ct. 2561, 2562 (2018). The "exercise of religion" also involves "the performance of (or abstention from) physical acts," such as "assembling with others for a worship service." Employment Div., Dep't of Human Res. of Or. v. Smith, 494 U.S. 872, 878 (1990).

Governmental actions challenged as violating the First Amendment's right to free exercise must first pass "two threshold tests," and the Court must then "balance[] competing governmental and religious interest[s]." Grosz v. City of Miami Beach, Fla., 721 F.2d 729, 733 (11th Cir. 1983). The first threshold test requires that the government not "regulate religious beliefs," but instead impose "restrictions affecting religious *conduct*." Id. (emphasis added). The second threshold requires "[governmental action] have both a secular purpose and a secular effect." Id. Governmental action has a non-secular purpose and thus "violates the Constitution if it is based upon disagreement with religious tenets or practices, or if it is aimed at impeding religion." Id. (citing Braunfeld v. Brown, 366 U.S. 599, 603 (1961)). Further, the governmental action's "essential effect" must not "influence negatively the pursuit of religious activity or the expression of religious belief"—rather, "any nonsecular effect, regardless of its significance, must be only an incident of the secular effect." Id. at 734. If a governmental action passes the two threshold

18

tests, the court "faces the difficult task of balancing government interests against the impu[gn]ed religious interest." Id. This balance "depends upon the cost to the government of altering its activity to allow the religious practice to continue unimpeded versus the cost to the religious interest imposed by the government activity." Id.

The first threshold test is satisfied here: Defendants Futch, Ferguson, and Hall did not "regulate religious beliefs," but instead "impose[d] restrictions affecting religious conduct" by allowing the church to be locked up. Id. The second threshold test is also satisfied; the facts show that Defendants' actions were not "aimed at impeding religion," but were instead aimed at maintaining the peace while the parties settled a bitterly contested property dispute. See id.; cf. Roman Catholic Diocese of Brooklyn, NY v. Cuomo, 592 U.S. __ (2020) (per curiam) (granting injunctive relief against challenged restrictions that "single out houses of worship for especially harsh treatment" where the Governor's statements "c[ould] be viewed as targeting the 'ultra-Orthodox [Jewish] community'" (quoting Agudath Israel of Am. v. Cuomo, 980 F.3d 222, 229 (2d Cir. 2020) (Park, J., dissenting))). There is no evidence in the record demonstrating that Defendants Futch, Ferguson, and Hall intended to impede religion by allowing the Armstrong sisters to lock down the church. Further, the non-secular effect of their actions was "only an incident of the

19

secular effect," namely, the locking down of property whose ownership was disputed. See id. at 734.

Of course, balancing the governmental interests against the religious interests here is a difficult task. The government's interest in protecting public health and welfare was certainly served by locking down the church; Defendants ensured that violence and/or property damage did not occur as a result of a heated property dispute. However, Plaintiffs' ability to worship in their church was infringed by Defendants' so doing. All factors considered, the difficult balance results in a decision in favor of the governmental interests. But regardless of whether the government's interests in health and safety outweigh Plaintiffs' religious interests, the Court can find no *clearly established* law that would put Defendants on notice that their actions were unconstitutional. Indeed, Plaintiffs conceded at the hearing that they have no case which would clearly establish their First Amendment claim. Thus, qualified immunity is in order for Defendants Futch, Ferguson, and Hall as to Plaintiffs' First Amendment claim against them, as is summary judgment.

### 2. Fourteenth Amendment Claim

Plaintiffs allege that Defendants Futch, Ferguson, and Hall violated their Fourteenth Amendment due process rights under section 1983 by doing the following "without the due process of law": invading New Covenant; threatening arrest of New Covenant's

members and preventing their worshipping; supervising and permitting the Armstrong sisters and others to steal New Covenant property; and making New Covenant off limits for all members and any other person who desired to worship there. Dkt. No. 71 ¶ 53. Plaintiffs argue that "[b]ut for the assistance of Defendant Futch" and "the ignoring of the Brunswick Police Department policies in determining that the sisters needed to have a deed to prove ownership," the unlawful seizure of the church by the Armstrong sisters would not have occurred. Dkt. No. 106-1 at 12. Because of this "active participation," Plaintiffs contend, the Fourteenth Amendment is implicated.[8]  Id. at 11.

It is true that "an officer may be liable for a [Fourteenth Amendment] due process violation when he actively assists one party in a property dispute to gain possession over the disputed property." Trolley Boats, LLC v. City of Holly Hill, Fla., No. 6:07-CV-1027-ORL-19G, 2009 WL 890386, at *7 (M.D. Fla. Mar. 31, 2009) (citing Marcus v. McCollum, 394 F.3d 813, 817–18 (10th Cir. 2004)). "Such an intervention might consist of preventing one party from interfering with the other party's seizure of the property, . . . or simply arriving at the scene with the seizing party to give the seizure a 'cachet of legality.'" Id. (citing

---

[8] Plaintiffs also allege that the police's "ignoring" two alleged prior requests for an "extra watch" on the property also constitute active participation in the Armstrong sisters' seizure of the church. Id. at 11. However, as stated above, see supra n.6, there is no evidence to suggest that these Defendants were involved in those extra watch requests.

Barrett v. Harwood, 189 F.3d 297, 302–03 (2d Cir. 1999); Booker v. City of Atlanta, 776 F.2d 272, 274 (11th Cir. 1985)).  However, a plaintiff alleging procedural due process violations must show that "adequate post-deprivation remedies were [not] available under state law."  Tinney v. Shores, 77 F.3d 378, 381 (11th Cir. 1996).

Plaintiffs allege that they have exhausted state remedies because they first filed this suit for equitable, injunctive, and declaratory relief in state court.  Dkt. No. 106-1 at 9. Defendants, on the other hand, argue that "Plaintiffs' failure to allege the lack of an adequate state remedy for the seizure is fatal to their claims. Plaintiffs promptly filed this suit and have settled all of their claims with the Armstrong sisters, leaving no question that Plaintiffs *did* have access to an adequate remedy."  Dkt. No. 96-1 at 20.

Defendants are correct; Plaintiffs "have not challenged the adequacy of [Georgia]'s post-deprivation remedies," so the Court "ha[s] no occasion to decide whether [Georgia] law does in fact provide adequate avenues for making the [Plaintiffs] whole." Tinney, 77 F.3d at 383.  Simply alleging that Plaintiffs filed first in state court and that Defendants removed it here does not satisfy the requirement that Plaintiffs show inadequacy of Georgia post-deprivation remedies.

Even if Plaintiffs *had* alleged and demonstrated inadequate state remedies, Defendants Futch, Ferguson, and Hall would be entitled to qualified immunity. The actions Plaintiffs complain of here essentially consist of the same series of actions which Plaintiffs allege violated the First Amendment. Defendants were on the scene functioning as police officers, and no party disputes that they were acting within their discretionary authority.

Officer Futch's threatening Ms. Nelson with arrest if she did not leave the property may have given the Armstrong sisters' seizure a "cachet of legality." Booker, 776 F.2d at 274. Sergeant Ferguson and Officer Hall's allowing the Armstrong sisters to continue locking up the church may also rise to active assistance. But see Williams v. Goldsmith, 4 F. Supp. 2d 1112, 1125 (M.D. Ala. 1998) (holding that "an officer's mere presence at (or after) a lawful instance of self-help repossession" does not violate a clearly established right to due process under the Fourteenth Amendment (quoting Cofield v. Randolph Cnty. Comm'n, 90 F.3d 468, 472 (11th Cir. 1996))).

However, it was *not* clearly established that police officers violate the Fourteenth Amendment by allowing one party to lock up the property that was the subject of a dispute between two private parties. No case in the Eleventh Circuit, the U.S. Supreme Court, nor the Georgia Supreme Court would have put these Defendants on notice that what they did was "so egregious that [they] must [have

been] aware that [they were] acting illegally." Trolley Boats, LLC, 2009 WL 890386, at *8 (quoting Thomas ex rel. Thomas v. Roberts, 323 F.3d 950, 953 (11th Cir. 2003)) (second alteration in original). Because Plaintiffs have not alleged or shown inadequate state remedies, and because Defendants would be entitled to qualified immunity regardless, Plaintiffs' Fourteenth Amendment claim against Defendants Futch, Ferguson, and Hall must fail, and summary judgment as to this claim is therefore appropriate.

**B. Defendants Spaulding and Henley**

**1. Fourth Amendment Claim**

Plaintiffs allege that Defendants Spaulding and Henley violated Ms. Nelson's Fourth Amendment rights by unlawfully and forcibly stopping and detaining Ms. Nelson without probable cause or reasonable and articulable suspicion. Dkt. No. 71 ¶ 57. Plaintiffs mainly take issue with the fact that Sergeant Henley did not tell Officer Spaulding that he knew who Ms. Nelson was, which caused "needless detention of Ms. Nelson." Dkt. No. 106-1 at 15–16.

While the Fourth Amendment protects against unreasonable searches and seizures, "[a]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Jackson v. Sauls, 206 F.3d 1156, 1165 (11th Cir. 2000) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)).

24

"[W]hile 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop."  Id. (quoting Wardlow, 528 U.S. at 123).  When a police officer prevents an individual "from leaving the scene," that individual is "'seized,' in the Terry sense."  United States v. Spencer, No. CR419-086, 2019 WL 5092481, at *3 (S.D. Ga. Oct. 10, 2019) (referring to Terry v. Ohio, 392 U.S. 1 (1968)), report and recommendation adopted, No. CV 4:19-CR-86, 2019 WL 6597848 (S.D. Ga. Dec. 4, 2019).

It is also true that a Terry stop must be "limited in time to that minimally necessary to investigate the allegation invoking suspicion, and limited in scope to identification and limited questioning reasonably related to the circumstances that justified the initiation of the momentary stop."  Raney v. State, 368 S.E.2d 528, 529–30 (Ga. Ct. App. 1988).  "In evaluating the reasonableness of an investigatory stop, we must examine whether the stop 'was reasonably related in scope to the circumstances which justified the interference in the first place.'"  United States v. Gil, 204 F.3d 1347 (11th Cir. 2000) (citing United States v. Sharpe, 470 U.S. 675, 685 (1985)).  The court must consider the "totality of the circumstances," "including the law enforcement purposes served by the detention, the diligence with which the police pursue the

investigation, the scope and intrusiveness of the detention, and the duration of the detention." Id. (quoting United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999), then United States v. Hardy, 855 F.2d 752, 759 (11th Cir. 1988)). Further, in considering the reasonableness of a Terry stop, courts may consider whether "a suspect's actions contribute to the added delay about which he complains." Sharpe, 470 U.S. at 688.

To stop Ms. Nelson in the first place, Officer Spaulding must have had "reasonable, articulable suspicion that criminal activity [wa]s afoot." Jackson, 206 F.3d at 1165. Officer Spaulding got out of her car to ask Ms. Nelson who she was because an extra watch was still in place on the building, and Ms. Nelson was peering into windows and attempting to open the door. Dkt. No. 96-2 at 69. "Courts have frequently recognized that loitering near abandoned buildings is a basis for reasonable suspicion of criminal activity." Id. (citing Clark v. City of Atlanta, 544 F. App'x 848, 854 (11th Cir. 2013); Butler v. City of Douglas, No. CV 514-055, 2016 WL 5661203, at *9 (S.D. Ga. Sept. 29, 2016)). New Covenant, as far as the police department and Officer Spaulding knew at that time, was closed, was the subject of a civil dispute, and no one was allowed to be on the property. Dkt. No. 96-2 at 68; Dkt. No. 110-5 at 15, 20. Officer Spaulding's decision to conduct a brief investigatory stop of Ms. Nelson, who seemed to be attempting to access this building, was reasonable.

After she had "effected a valid [Terry] stop, [Officer Spaulding] was authorized to request and examine [Ms. Nelson]'s driver's license . . . or . . . request [Ms. Nelson's] name and date of birth . . . to run a computer check on such documents." Darby v. State, 521 S.E.2d 438, 441 (Ga. Ct. App. 1999). The law is "well established that an officer may ask a suspect to identify himself during the course of a Terry stop." United States v. Stevenson, No. 206-CR-89-WKW (WO), 2006 WL 2853056, at *3 (M.D. Ala. Oct. 4, 2006) (quoting Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty., 542 U.S. 177, 186 (2004)). Ms. Nelson refused to give Officer Spaulding her date of birth, and Officer Spaulding kept Ms. Nelson there, in front of the church, not handcuffed, for approximately fifteen minutes. Dkt. No. 96-2 at 80. Once Ms. Nelson gave her date of birth, Officer Spaulding did not detain her for any longer than was necessary to search for Ms. Nelson in the databases. Officer Spaulding's stop was "limited in time to that minimally necessary to investigate the allegation invoking suspicion," i.e., her suspicion that Ms. Nelson was criminally trespassing on property, and "limited in scope to identification." Raney, 368 S.E.2d at 529.

Sergeant Henley's arrival and subsequent asking for Ms. Nelson's date of birth was also limited to the scope of the original stop: identifying Ms. Nelson so that Officer Spaulding could run her name through the databases and determine whether she

had any outstanding warrants or criminal trespass warnings.  Dkt.
No. 96-2 at 71, 73, 75, 79.  That Sergeant Henley was familiar
with Ms. Nelson does not change the fact that they could not run
her name through the databases without her date of birth.
Defendants Spaulding and Henley did not violate Ms. Nelson's Fourth
Amendment rights during this investigatory stop, and summary
judgment as to this claim is thus appropriate.

### 2. False Imprisonment Claim

Plaintiffs allege that Defendants Spaulding and Henley
falsely imprisoned Ms. Nelson based on the same allegedly wrongful
detention implicated in their Fourth Amendment claim.  See Dkt.
No. 71 ¶ 66.

"A detention on the basis of a false arrest presents a
viable section 1983 action."  Ortega v. Christian, 85 F.3d 1521,
1526 (11th Cir. 1996) (citing Reeves v. City of Jackson, 608 F.2d
644 (5th Cir. 1979)).  "Where a police officer lacks probable cause
to make an arrest, the arrestee has a claim under section 1983 for
false imprisonment based on a detention pursuant to that arrest."
Id. (citing Groman v. Twp. Of Manalapan, 47 F.3d 628, 636 (3d Cir.
1995)).  "A § 1983 false imprisonment claim must meet the elements
of common law false imprisonment."  Cannon v. Macon Cnty., 1 F.3d
1558, 1562-63 (11th Cir. 1993), opinion modified on reh'g, 15 F.3d
1022 (11th Cir. 1994).  "The elements of common law false
imprisonment are '(1) intent to confine, (2) acts resulting in

confinement, and (3) consciousness of the victim of confinement or resulting harm.'" Id. at 1562 n.3 (quoting Douthit v. Jones, 619 F.2d 527, 532 (5th Cir. 1980)).

Fatal to their false imprisonment claim is the fact that Ms. Nelson was never arrested in the first place. See Ortega, 85 F.3d at 1526. As demonstrated above, Defendants Spaulding and Henley merely performed a Terry stop on Ms. Nelson, which never rose to the level of detainment necessary for a false imprisonment claim. See supra section III.B.2. Summary judgment for Defendants must be granted as to Plaintiffs' false imprisonment claim.

## C. The Armstrong Sisters

Plaintiffs continue to request that the Court make permanent its preliminary injunction declaring that New Covenant "belongs to its members to the exclusion of the daughters and any other nonmember." Dkt. No. 71 ¶ 87. Defendants argue that Plaintiffs' request for further relief against the Armstrong sisters is inappropriate because the Armstrong sisters are no longer defendants in this case. Dkt. No. 96-1 at 29.

Defendants are correct. The declaratory judgment Plaintiffs seek would effectively enjoin non-parties, the Armstrong sisters, from asserting ownership over New Covenant—and would do so after the Armstrong sisters have been dismissed with prejudice from this lawsuit following a mediated settlement of claims that did not result in imposition of a permanent injunction. Even if the Court

had jurisdiction to do so, the Court finds no just cause at this stage.

## IV.  CONCLUSION

For the above reasons, Defendants' Motion for Summary Judgment, dkt. no. 96, is **GRANTED** in its entirety.  The Clerk is **DIRECTED** to enter judgment for Defendants and close this case.


**SO ORDERED**, this 5th day of February, 2021.


_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA